UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLIFTON HUNT

    Plaintiff,                                             Civil Action No. 06-12391

v.                                                      HON. Arthur J. Tarnow
                                                           U.S. District Judge
                                                           HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL               U.S. Magistrate Judge
SECURITY,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Clifton Hunt brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Supplemental Security Income under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). I recommend that Defendant's Motion for Summary Judgement be GRANTED, and that Plaintiff's Motion for Summary Judgement be DENIED.

**PROCEDURAL HISTORY**

On March 20, 2002, Plaintiff filed an application for Supplemental Security Income ("SSI"), alleging an onset date of July 3, 1997 (Tr. 48-50). After the Social Security Administration denied benefits on September 3, 2002, he made a timely request for an

administrative hearing, held on October 29, 2003 (Tr. 34, 363). Administrative Law Judge ("ALJ") Melvyn Kalt presided (Tr. 361). Plaintiff, represented by attorney Eva Guerra, testified, as did vocational expert ("VE") Ms. Pegram (Tr. 363-391). On July 16, 2004, ALJ Kalt determined that Plaintiff was not disabled, finding that he could perform a significant number of jobs in the national economy (Tr. 21). On March 24, 2006, the Appeals Council denied review (Tr. 5-7). Plaintiff filed for judicial review on the final decision on May 22, 2006.

**BACKGROUND FACTS**

Plaintiff, born December 31, 1955, was age 48 when the ALJ issued his decision (Tr. 17). He has a high school education and worked previously as a security guard and hi-lo driver (Tr. 17). He alleges disability as a result of arthritis, complete loss of vision in his right eye, and poor vision in his left eye (Tr. 52).

**A.     Plaintiff's Testimony**

Plaintiff testified that he resided in Pontiac, MI and had a high school education (Tr. 364). He indicated that he was currently married, but had recently separated from his wife (Tr. 364). Plaintiff stated that he had two children currently living with him: age eight and seventeen (Tr. 365). Plaintiff reported that in the previous 15 years he had worked as a security guard and in shipping and receiving (Tr. 365). Plaintiff spent a substantial portion of the security guard job walking and carrying approximately 15 pounds (Tr. 365). Plaintiff testified that his shipping and receiving job required him to unload trucks and carts and stock supplies of up to 100 pounds, allowing him to sit for approximately 30 minutes a day (Tr.

366). Plaintiff stated that he was dismissed due to absenteeism because of his injury, adding that back problems he had from working at K-Mart were exacerbated by a June 1997 car accident (Tr. 366).

Plaintiff testified that as a result of his car accident, pain precluded him from sitting for lengthy periods of time (Tr. 367, 369). He also reported knee, foot, elbow, shoulders and neck pain. (Tr. 367). Plaintiff further that he had been the victim of an attack which resulted in the loss of right eye vision (Tr. 367-368).

Plaintiff estimated that his pain level was generally "about 5 or 6" out of 10, but ranged anywhere between "4" and "10" (Tr. 368). He reported taking Celebrex, Vioxx, Tylenol 3 with Codeine, and Bextra at the same time (Tr. 369). He also reported pain in the kidney area, attributing his discomfort to diabetes (Tr. 369).

Plaintiff reported pain as a result of a metal plate implanted in his skull (Tr. 370). He testified that he could read only with the aid of glasses or a magnifying glass, adding that he no longer has peripheral vision (Tr. 370-371). He alleged that since he left work in 1997, he spent approximately 19 out of 24 hours either reclining or sleeping (Tr. 371-372). He testified that foot pain obliged him to remove his shoes, stating also that he obtained relief by elevating his feet (Tr. 373-374). Plaintiff claimed that his pain caused him to be depressed and irritable (Tr. 374). He stated that he could no longer play sports or enjoy other hobbies, reporting that cramps in his fingers required him to use both hands to grasp cups or dishes (Tr. 375).

Plaintiff testified that damp weather exacerbated his joint pain, indicating that foot

pain obliged him to limit his driving (Tr. 375-376). He claimed that he could sit for one hour, stand for 30 minutes or walk for 15 minutes before experiencing back and foot pain (Tr. 376-377). He denied mental health treatment (Tr. 378).

### B. Medical Evidence

#### i. Treating Sources

In June 1984, Plaintiff was treated for a stab wound to the hand (Tr. 89-90). Imaging studies performed on his cervical spine, lumbosacral spine, and pelvis in August 1997 yielded normal results (Tr. 92-94). After complaints of back and neck pain in September 1997, Dr. Beauchamp noted that the "pain and tenderness at the right sacroiliac joint [was] without evidence of radicular symptoms" (Tr. 163). Dr. Beauchamp injected Plaintiff's right sacroiliac joint with Xylocaine and Marcaine/Aristocort, prescribing him EC Naprosyn (500mg), and four weeks of physical therapy. Physical Therapist ("PE") Christine Westbrook noted that Plaintiff experienced pain and a decreased range of motion (Tr. 98). In October 1997, Westbrook noted that Plaintiff had been making "excellent progress" and was "demonstrating improvements in all areas" after having attended six physical therapy sessions (Tr. 103). Plaintiff did not show for his next two physical therapy appointments the same month, citing insurance difficulties (Tr. 104). In December 1997, Dr. Beauchamp diagnosed Plaintiff with osteoarthritis in both knees and sacroilitis, noting that his back pain had improved with continued upper/lower extremity, knee, ankle, and hand pain (Tr. 164). In September,1998, Dr. Schmidt diagnosed Plaintiff with chronic lumbar strain, finding that although surgery was unnecessary, physical therapy should be resumed (Tr. 164-165).

In June 1999, Plaintiff sought emergency treatment for pain and swelling in the right testicle (Tr. 106, 121, 335). He was prescribed hydration and antibiotics as well as Doppler ultrasound on the testicles (Tr. 121). Plaintiff was diagnosed with right epididymal orchitis (Tr. 335). The following month, Plaintiff's right testicle was removed (Tr. 159-160).

In June 9 2000, Plaintiff again sought emergency treatment after being attacked and struck multiple times with a "2 x 4" block of wood (Tr. 226). Upon examination of Plaintiff, Arlin French D.O., noting that Plaintiff reported the loss of right eye vision, found that he retained 20/30 vision in his left eye (Tr. 226). He noted further that Plaintiff was intoxicated at the time of examination and was "somewhat uncooperative" (Tr. 226). That same day, French successfully performed a procedure closing the orbit and globe area of Plaintiff's right eye (Tr. 223-225) Plaintiff was discharged after being diagnosed with Orbital trauma with a ruptured globe of the right eye, facial lacerations, four-wall orbital wall fracture of the right eye, and total hyphema,

Followup treatment notes indicate that Plaintiff complained of pain in his right eye and difficulties sleeping (Tr. 305-306). In July 2000, Dr. Ruby successfully performed a procedure re-attaching his right retina, noting the following month that Plaintiff's pain was "almost completely resolved" (Tr. 228-230, 297). On August 11, 2000, Surgeon Gregory Roche, D.O., successfully performed a "right trimalar open reduction and internal fixation and right blowout repair" procedure on Plaintiff to repair the fractured area around his right eye (Tr. 236-238). The same month, Plaintiff complained of arthritis in his feet, knees, back, and neck (Tr. 260). In October 2000, Dr Ruby noted that Plaintiff's prognosis for

improvement in visual activity was extremely poor (Tr. 258).

In April 2002, Plaintiff was diagnosed with possible diabetes mellitus without complication, type II (Non-insulin Dependent) (Tr. 166). On April 7, 2002, treating physician Brian Swilley, D.O., noted that chest studies returned negative in response to Plaintiff's complaints of a cough (Tr. 181). After Plaintiff complained of abdominal pain the same month, Fadi Salloum, M.D., noted suspected gastritis, noting that an ultrasound examination of the abdomen returned negative (Tr. 182-183). On April 19, 2002, Plaintiff sought treatment after experiencing symptoms of hypoglycemia (Tr. 309). In July 2002, Dr. Swilley diagnosed Plaintiff with arthritis and diabetes, noting that the diabetes had not resulted in any end organ damage (Tr. 313). He reported that Plaintiff had no sensory, motor, or reflex abnormalities but noted that Plaintiff had suffered from ongoing discomfort of sacroilliac pains for the past 2-3 years (Tr. 314). Dr. Swilley noted normal range of motion for the cervical spine, shoulders, and elbows, but slightly less than normal range of motion in the dorsolumbar spine (Tr. 316).

On October 27, 2003, Dr. Swilley performed a physical capacities evaluation, concluding that Plaintiff could sit or stand for up to one hour and walk for 15-20 minutes (Tr. 348). He found that over the course of a workday, Plaintiff could sit for a total of 2-4 hours, stand for a total of 1-2 hours, and walk for a total of 30 minutes (Tr. 348). Dr. Swilley added that Plaintiff could occasionally lift and carry a maximum of ten pounds (Tr. 348). He noted that Plaintiff could not use either of his hands for repetitive gripping, pushing, or pulling of arm controls (Tr. 348). He found further that Plaintiff could not use either of his

feet for repetitive movements as in pushing or pulling of leg controls (Tr. 348). Dr. Swilley reported that Plaintiff could occasionally bend or squat but could never crawl, climb, or reach (Tr. 348). He completely restricted Plaintiff from activities involving unprotected heights, being around moving machinery and exposure to marked changes in temperature and humidity, while placing mild restrictions on driving automotive equipment and exposure to dust, fumes and gases (Tr. 348).

    **ii.**    **Consultive and Non-Examining Sources**

In November 2000, a consultive exam performed by Peter Samet, M.D., found that Plaintiff suffered from osteoarthritis with a full range of motion, lower back pain, and an injury to the right eye (Tr. 263). Dr. Samet added that Plaintiff was "independent" with his basic activities in daily life including driving (Tr. 263).

In January 2001, a physician hired on behalf of the SSA performed a Physical Residual Functional Capacity Assessment of Plaintiff's condition on the basis of treating records (Tr. 81-88). The report found that Plaintiff retained the ability to lift 50 pounds occasionally, and 25 pounds frequently, along with the ability to sit, stand, or walk for approximately six hours in an eight-hour work day (Tr. 82). Within the above-stated exertional range, Plaintiff was deemed to retain the unlimited ability to push or pull (Tr. 82). The report further deemed Plaintiff capable of frequent ramp and stair climbing but advised against any ladder, rope, or scaffold climbing (Tr. 83). It added that Plaintiff could balance, kneel, and crawl frequently and could stoop or crouch occasionally (Tr. 83). The report found that Plaintiff had no manipulative limitations, but noted that he has visual limitations

in the right eye due to a detached retina (Tr. 84). Plaintiff had no communicative or environmental limitations except the avoidance of all hazards (Tr. 85). The assessment concluded by stating that Plaintiff was "partially credible," noting that the "medical evidence [was] inconsistent with his alleged levels of lifting" (Tr. 86).

### C. Vocational Expert Testimony

Vocational Expert Ms. Pegram characterized Plaintiff's former work in shipping and receiving as very low-end semi skilled at the "heavy to very heavy" exertional level (Tr. 379). She characterized Plaintiff's former work of industrial truck operation as low-end semi skilled at the light exertion level (Tr. 379-380).

The ALJ posed the following hypothetical question:

> If I were to find the claimant was capable of lifting 10 pounds repeatedly, 20 pounds occasionally. That he require the opportunity to sit or stand at his own option. And that having monocular vision, he wouldn't be able to perform any jobs that require depth perception or for any other reason binocular vision. And that he would be able to elevate his leg to chair height while performing whose, while sitting and performing work. Further that the job be low stress and simple, two and three step operations. Would there be work that he could perform?

(Tr. 381). Given the above limitations, the VE found that such an individual could perform unskilled work at the light level of exertion, including work as an inspector, sorter, or packager (16,500 jobs) (Tr. 381-382). She stated that if the Plaintiff's testimony were fully credited, the Plaintiff would be unable to perform light work (Tr. 380). The VE concluded by stating that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), adding however that the DOT was silent as to stand/sit options (Tr. 382).

### D. The ALJ's Decision

On July 16, 2004, ALJ Kalt found that Plaintiff retained the residual functional capacity ("RFC") to do "light work with limitations of a sit/stand option, jobs requiring only monocular vision, a low stress environment, and only simple routine tasks" (Tr. 20). He determined that although Plaintiff experienced the severe impairments of right eye blindness, low back pain, osteoarthritis, and diabetes, none of his conditions met or medically equaled "one listed in Appendix 1, Subpart P, Regulations No. 4." He found that although Plaintiff was unable to resume his past relevant work as a security guard or hi-lo driver, he retained the ability to perform entry-level visual inspection, sorting, and packaging jobs (Tr. 17-21). In making his non-disability finding, the ALJ noted that although Plaintiff claimed his medication caused nausea, "the clinical findings do not substantiate complaints or treatment for disabling nausea" (Tr. 18). Furthermore, the ALJ reported that although Plaintiff testified that he was depressed, he had not received a diagnosis or treatment for depression (Tr. 18). The ALJ also noted that despite the loss of right eye vision, Plaintiff's left eye vision was "excellent" allowing him to "continue[] to drive without significant difficulty" (Tr. 19).

### **STANDARD FOR REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherill v. Secretary of Health and Human Services*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

**FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has

the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984).

## ARGUMENT

A.  *Res Judicata*

Plaintiff argues that the ALJ erred by re-litigating a March 31, 2001 Disability Insurance Benefit ("DIB") finding. Under the principle of *res judicata*, Plaintiff argues that the ALJ is required to follow the prior conclusion that he could perform only unskilled, sedentary work.

"Res judicata is a common-law concept which prescribes that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Drummond v. Commissioner of Social Security Administration*, 126 F.3d 837, 840 (6th Cir. 1977) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). "Social security claimants are bound by the principles of res judicata." *Id* at 841. "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id* at 842. Acquiescence Ruling 98-4, codifying this circuit's decision in *Drummond*, provides:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council

-11-

>on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in law, regulations, or rulings affecting the finding or method for arriving at the finding.

AR 98-4(6).

However, contrary to Plaintiff's argument, the subsequent ALJ was not bound by the March 2001 findings. AR 98-4(6) only applies to subsequent claims "arising under the same title of the Act as the prior claim." *Id.* Plaintiff's initial application was for disability insurance benefits ("DIB"), which is under Title II of the Social Security Act. However, his current application is for SSI under Title XVI of the Act. Plaintiff's applications were brought under different titles of the Act, thus AR 98-4(6) and *Drummond,* are not applicable. The subsequent ALJ was not, as Plaintiff contends, bound by the findings of the previous ALJ under the principle of *res judicata*.

**B.     Credibility**

Plaintiff argues further that the ALJ's erred by underestimating the severity and limitations of his symptoms. Plaintiff, citing Social Security Ruling 96-7p and *Lakowski v. Apfel*, 100 F.Supp.2d 474 (E.D. Mich. 2000), argues that the ALJ chose to ignore sections of the record supporting Plaintiff's allegations.

As a general rule, the courts cede enormous latitude to the ALJ's credibility determinations. *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1234 (6th Cir. 1993); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). An ALJ's credibility determination is guided by SSR 96-7p, which further describes a two-step process for

evaluating symptoms. *See Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). "First the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment . . . that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id*. Second, SSR 96-7p requires that:

> "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."

*Id*.

Record evidence amply supports the ALJ's credibility determination. Although Plaintiff alleges that the ALJ overlooked limitations created by right eye injuries, the ALJ in fact considered Plaintiff's loss of right eye vision, but went on to cite medical records showing that his left eye vision was very close to normal (Tr. 19, 226). The ALJ further accounted for Plaintiff's right eye blindness by limiting him to jobs requiring only monocular vision (Tr. 19-20). The record also shows that Plaintiff's retained the ability to drive without significant difficulty, acknowledging at the hearing that he continued to drive his daughter to school (Tr. 19, 376). Moreover, evidence that Plaintiff continued to drive entitled the ALJ to conclude that that he has relatively good use of his arms and is capable of turning his neck. *See Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 231 (6th Cir. 1990).

Contrary to Plaintiff's argument that he did not address other examination findings revealing decreased range of motion, the ALJ properly considered all evidence of record

noting that Plaintiff "exhibited full range of motion of the cervical and lumbar spine with no limitations regarding the upper extremities or any swelling in the lower extremities." (Tr. 19). Treating physician Dr. Swilley's April 2002 records support this, indicating that Plaintiff's range of motion for the cervical spine, shoulders, and elbows was normal, with a range of motion in the dorsolumbar spine only slightly less than normal (Tr. 316).

The administrative decision also thoroughly considered the extent of Plaintiff's back and lower extremity impairments (Tr. 20). The ALJ points out that in November 2000, he "exhibited good strength throughout all the extremities, no muscle atrophy which is typically associated with severe and disabling pain, and no neurological deficit" (Tr. 19, 175). *See Blacha*, *supra*, 927 F.2d at 231. Despite Plaintiff's claim that he was unable to wear shoes due to swelling in his feet, the record shows no evidence of swelling in the lower extremities or limitations regarding the upper extremities (Tr. 19). His complaints of pain in the left shoulder were relieved with medication, further discrediting his claims that he was unable to perform light work (Tr. 317, 318). The record shows no evidence of sensory, motor, reflex, or nerve root abnormalities (Tr. 314-315). The ALJ noted that although Plaintiff was diagnosed with diabetes mellitus, treating physician Swilley found that it resulted in no end organ damage (Tr. 18, 313).

### C. Treating Physician

Plaintiff also faults the ALJ for giving limited weight to Dr. Swilley's October 27, 2003 "Physical Capacities Evaluation." Citing *Portwood v. Commissioner of Social Security*, 396 F.Supp2d 799 (E.D. Mich. 2005) and *Walker v. HHS*, 980 F.2d 1066 (6th Cir. 1992), he

contends that the failure to adopt Swilley's assessment tainted the ultimate finding of non-disability.

In *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (footnote 7) (6th Cir. 1991) the court held that "it is well-settled in this circuit that treating physicians' opinions, based on objective evidence, should be accorded significant weight. If uncontradicted, the physicians' opinions are entitled to complete deference." In *Wilson v. Commissioner of Social Sec*. 378 F. 3d 541, 544 (6th Cir. 2004) the court stated:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors–namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion with the record as a whole, and the specialization of the treating source–in determining what weight to give the opinion.

Further, the "ALJ must 'give good reasons' for not giving weight to a treating physician in the context of a disability determination." *Id*.; 20 C.F.R. §404.1527(d)(2) (2004).

The ALJ, noting that Swilley's October 2003 findings stood at odds with other portions of the record, properly rejected the treating physician's opinion. Swilley's finding that Plaintiff was incapable of simple grasping with either hand of course stands at odds with Plaintiff's own testimony that he continued to drive on a fairly regular basis. More obviously, Swilley's treatment records contradict his October 2003 assessment. The ALJ noted that despite Dr. Swilley's opinion that Plaintiff could only sit for four hours, stand for two hours, walk for one hour, and lift 10 pounds, Swilley's July 2002 reports indicated that

Plaintiff had normal cervical spine, bilateral shoulder, and bilateral elbow motion, some limitation of motion of the lumbar spine, and no sensory, reflex or motor abnormalities, or nerve root abnormalities (Tr. 19, 314, 316). Significantly, none of Plaintiff's treating sources found that his condition worsened between July 2002, and October 2003 (Tr. 19). "The ALJ . . . is not bound by a conclusory statement of the treating physician regarding the claimant's disability, particularly when the statement lacks medical support." *Durrette v. Commissioner of Social Sec.*, No. 94-3734, 1995 WL 478723, at *3 (6th Cir. 1995); *see also King v. Heckler,* 742 F.2d 968, 973 (6th Cir. 1984); *Halsey v. Richardson,* 441 F.2d 1230, 1235 (6th Cir. 1971). Because Swilley's assessment is contradicted by his own treating notes as well as other portions of the record, the ALJ was entitled to reject his findings.

**D.     Vocational Testimony**

Finally, Plaintiff argues that the VE's job findings, made in response to hypothetical question which omitted a portion of his work related limitations, do not constitute substantial evidence. Further, he contends that while the hypothetical question included a requirement allowing Plaintiff to "elevate his leg to chair height" while working, the VE impermissibly interpreted "chair height" as "12 to 15 inches." (Tr. 381, 382). Plaintiff also argues that the hypothetical question excluded his need for a cane.

The ALJ's function is to "determine what medical restrictions [Plaintiff is] under and how they affect[] his residual functional capacity" *Maziarz v. Secretary of Health & Human Services*, 837 F.2d 240, 247 (6th Cir. 1987). He must then "determine whether the vocational expert had identified a significant number of jobs in a relevant market given these

restrictions." *Id.* The ALJ's hypothetical question need only include the limitations set forth in the record. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

The VE's interpretation of "chair height" as "12 to 15 inches" does not present grounds for remand. First, the ALJ's assent to this interpretation can be inferred by the fact that he did not correct her interpretation that "chair height" was equivalent to "12 to 15 inches" (Tr. 382-383). More fundamentally, substantial evidence found throughout the record supports the VE's finding that Plaintiff did not require more than a 12 to 15 inch elevation.[1] The hypothetical question and the VE's response, well supported by substantial evidence, conforms with the requirement of *Varley*, *supra*, 820 F.2d at 779.

Likewise, although Plaintiff's use of a cane is well documented (Tr. 64, 262), the omission of cane use from the hypothetical does not invalidate the VE's job findings. The post- hearing report submitted by the VE (see FN 1) shows that Plaintiff's need for a cane would not impede his ability to perform unskilled, exertionally light work:

> "These unskilled, light jobs are found largely in industrial, manufacturing settings where the work is performed at a bench or tabletop away from the main high speed production line and where a chair and/or stool can be provided. In this manner, the employee can continue to perform work tasks while in either a seated or standing position. . . . elevation of the lower extremities at a footstool height (12-15 inches) could be accommodated beneath the work bench or table top when the employee is exercising the

---

[1] A post-hearing report submitted by VE Pauline Pegram further confirms that the ALJ concurred with her assumption that "chair height" meant "12 to 15" inches (355). "In a follow-up question by the claimant's attorney, it appears your Honor modified 'chair height' to mean 12 to 15 inches as I testified that I had essentially already incorporated those measurements into my original response to your hypothetical." *Id.*

-17-

sitting option."

(Tr. 357). The above job findings, which acknowledge Plaintiff lack of mobility by requiring only minimal walking, are also supported by Plaintiff's own statement that he retained the ability to walk up to two blocks (Tr. 64).

In closing, this Court's finding that the administrative decision should be upheld is not intended to trivialize legitimate limitations as a result of limited vision and arthritis. However, based on a careful reading of this record, the ALJ's decision is within the "zone of choice" accorded to the fact-finder at the administrative level. Pursuant to *Mullen v. Bowen*, *supra*, the ALJ's decision should not be disturbed by this Court.

## **CONCLUSION**

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgement be GRANTED and that Plaintiff's Motion for Summary Judgement be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                              S/R. Steven Whalen  
                                              R. STEVEN WHALEN  
                                              UNITED STATES MAGISTRATE JUDGE

Dated: August 31, 2007

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 31, 2007.


                                              S/Gina Wilson  
                                              Judicial Assistant